## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| CRISTIAN MARTINEZ and PAUL ESTRADA, individually and on behalf of all others similarly situated, ) ) ) ) | CASE NO. 6:22-cv-00171 |
| Plaintiffs, ) ) | CLASS ACTION COMPLAINT |
| v. ) ) | |
| ANDERSON COUNTY; KARINA GARCIA, in her official capacity as ANDERSON COUNTY BOND SUPERVISION OFFICER, ) ) ) ) | JURY DEMANDED |
| Defendants. ) ) | |

## INTRODUCTION

1.      Defendants operate a wealth-based discrimination scheme, requiring pre-trial arrestees — who have not been found guilty of any crime — to pay ongoing bond supervision and urinalysis fees without considering their ability to pay.  Non-payment of these fees can land pre-trial arrestees back in jail, and fees are not reimbursed if a pre-trial arrestee is later acquitted or charges are dropped.

2.      In 2012, Defendant Anderson County created the Anderson County Community Bond Supervision Office ("Bond Office").  The stated purpose of the Bond Office is to track individuals charged (but not convicted) with a crime who have been placed on pre-trial supervision and report their progress to the court.  The actual function of the Bond Office is to squeeze money out of pre-trial arrestees to cover the salary and operating expenses of the Bond Supervision Officer (Defendant Karina Garcia) and the Bond Office.

3.      At the Bond Office, Bond Officer Karina Garcia tells pre-trial arrestees that they must pay a $50.00 per month bond supervision fee ("bond fee") to the Bond Office.  Officer Garcia also explains that, for those on drug testing conditions, they must pay $20 per test. Pre-trial arrestees are usually first made aware of these fees during their initial visit to the Bond Office. Officer Garcia does not assess pre-trial arrestees' ability to pay these fees.

4.      To induce payment, Officer Garcia creates fear of incarceration for non-payment. Officer Garcia states that, as a bond condition, the bond fee must be paid or the pre-trial arrestee can be violated and sent back to jail.  Officer Garcia also asks pre-trial arrestees during intake and at every subsequent check-in about pre-trial arrestees' finances and their bond fee payment history, recording that information on official Bond Office documents.   Officer Garcia reports non-payment of the bond fee to the district attorney and the court.

5.      This monthly bond fee is in addition to whatever bond payment the individual already made as part of their bail.  Thus, pre-trial arrestees who have paid a bond amount to be released from jail must pay an additional, ongoing monthly bond fee to *remain* out of jail. Defendants thus tie pre-trial arrestees' freedom to payment of the bond fee.

6.      Defendant Garcia's main responsibility is to collect the bond fee, which in turn pays for her salary.  In essence, Anderson County has hired a debt collector to collect the salary of the debt collector.

7.      The bond fee is thus a surprise ransom fee for pre-trial arrestees: imposed without due process, paid to the very person whose salary it funds, and paid under threat of incarceration.

8.      Since the establishment of the Bond Office, thousands of individuals similarly situated to Plaintiffs have been placed under the supervision of the Bond Office and paid monthly bond fees to Defendants.

9.      Since the inception of the Bond Office, Defendants have collected hundreds of thousands of dollars in bond fees.

10.     As a result of these constitutional violations, Plaintiffs request a preliminary injunction and permanent injunction to enjoin Defendants from charging bond and urinalysis fees for pre-trial arrestees and from asking specific questions in Bond Office forms.  Plaintiffs also request damages for the unconstitutional fees they were forced to pay.

## PARTIES

11.     Plaintiff Cristian Martinez is an adult male resident of Anderson County, Texas. Ex. 1, Declaration of Cristian Martinez.

12.     Plaintiff Paul Estrada is an adult male resident of Anderson County, Texas. Ex. 2, Declaration of Paul Estrada.

13.     Defendant Anderson County, Texas ("Anderson County") is a Texas county.  The Anderson County Bond Supervision Office ("Bond Office") is a department of Defendant Anderson County.  The Bond Office has one employee, Defendant Karina Garcia.  Anderson County has adopted a county-wide policy of charging a monthly bond fee for pre-trial arrestees assigned to the Bond Office and urinalysis fees for pre-trial arrestees assigned to the Bond Office who are required to drug test.  Ms. Garcia, along with the county's Criminal Debt Collections Director Kirstie Quinn, are responsible for collecting the bond fee.

14.     Defendant Karina Garcia is the Bond Supervision Officer for the Bond Office.  Ms. Garcia issues monthly reports to Anderson County Judge Johnston regarding the amount of bond supervision and other pre-trial fees that have been collected and remain outstanding, as well as the status of any sanctions and other notes related to pre-trial fees.  Ms. Garcia also determines, solely on the basis of her discretion, whether pre-trial arrestees have to report in person or can report over

3

the phone.  Ms. Garcia also has discretion to determine how often a pre-trial arrestee drug tests, for which pre-trial arrestees must pay out of pocket.  Thus Ms. Garcia is allowed to determine how much money is charged and collected, which in turn pays for her salary.

## JURISDICTION AND VENUE

15.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and federal statutes including but not necessarily limited to 42 U.S.C. § 1983.

16.     The court has personal jurisdiction over Anderson County because it is a Texas county.

17.     Venue is proper in the Tyler Division of the United States District Court for the Eastern District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).  All Defendants are residents of Texas and are residents of the Eastern District of Texas, Tyler Division.  Anderson County is a Texas county.

## FACTUAL ALLEGATIONS

**A.     Defendants Charge Fees to Pre-Trial Arrestees on Bond Supervision Without Findings of Guilt, Without Assessing Ability to Pay, and on Penalty of Incarceration**

18.     Typically, when someone is arrested in Anderson County, they are booked at the county jail and only released if they can pay a surety, cash, or personal bond.  Many arrestees pay 10–15% of a bail amount to a private company to secure their release, and this pre-trial payment-for-release is not refundable, regardless of whether the individual is later exonerated of any charges.

19.     After being released pre-trial from the county jail by posting a bond, some individuals are then placed on bond supervision.

20.     Bond supervision involves reporting to Defendant Garcia, Anderson County's Bond Supervision Officer, at the Anderson County Bond Office.

21.     Defendant Garcia monitors compliance with court-ordered conditions of release.

22.     Those conditions include payment of pre-trial fees.

23.     Those pre-trial fees pay for Defendant Garcia's salary and the Bond Office's operating expenses.  As Judge Johnston testified during a February 13, 2012, meeting of the Anderson County Commissioners' Court regarding the establishment of the Bond Office, the County could "collect [in bond fees] pretty much what we will start this [bond supervision] officer out at" in terms of salary.  Ex. 3, Meeting Transcript.

24.     Judge Johnston is the same judge who receives monthly reports from Defendant Garcia on how much money she collects for the Bond Office.  *See, e.g.*, Ex. 4, January 2022 Monthly Bond Office Report.

25.     Defendant Garcia assesses pre-trial fees without considering pre-trial arrestees' ability to pay. There is no ability to challenge the fees or have them reduced or waived.

26.     Pre-trial arrestees on drug testing are subject to a drug testing fee; they must pay $20 per test.

27.     All pre-trial arrestees on bond supervision must pay a $50 monthly fee for bond supervision.

28.     The bond fee is ongoing and indefinite; Defendants charge the fee every month for as long as a case is in pre-trial status.

29.     The bond fee is not tied to a pre-trial arrestee's bail amount; the bond fee is a flat fee.

30.     The bond fee is non-refundable; even if a pre-trial arrestee is acquitted or his charges are dropped, he is not reimbursed.

31.     If a pre-trial arrestee still has outstanding bond or urinalysis fees at the time his case is closed, Defendants will still attempt to collect the fees and suspend the driver's licenses of those unable to pay. *See* Ex. 5, Sample Collection Letter from Bond Officer Garcia.

32.     While a case is in pre-trial status, Defendants enforce these fees through the threat of incarceration. Payment of these fees is a condition for pre-trial arrestees to remain free. Defendant Garcia reports non-payment of fees as a violation to the district attorney and the court, which can result in incarceration of the non-paying pre-trial arrestee.

33.     At every check-in at the Bond Office, Defendant Garcia also requires pre-trial arrestees to fill out forms that ask intrusive questions unrelated to the duties of the Bond Office.

34.     Defendants ignore the presumption of innocence inherent to the American judicial system, and instead subject pre-trial arrestees to an unconstitutional pre-trial fee scheme that also undermines pre-trial arrestees' right to privacy.  In creating a system that punishes the legally innocent and pushes the cost of that system onto the very people it punishes, Defendants make clear that the purpose of bond supervision is not public safety, but rather the creation of a revenue stream.

**B.      Plaintiffs Are Charged Bond Fees Without Any Finding of Guilt or Ability to Pay Assessment and Risk Jail if They Do Not Pay**

35.     Plaintiff Martinez has been on bond supervision since December 2021.

36.     He is required to report in person on a monthly basis and pay bond supervision fees.

37.     Plaintiff Martinez is indigent and cannot afford these fees, but he pays what he can to avoid jail.

38.     Plaintiff Martinez has already been back to jail for violating another pre-trial condition (drug testing).

39.     Plaintiff Martinez is required to fill out an intake form during each check-in that asks him, among other matters, questions about his health, personal relationships, and finances.

40.     Plaintiff Martinez has not been convicted of the crime for which bond supervision was ordered.

41.     Plaintiff Estrada has been on bond supervision since November 2021.

42.     Plaintiff Estrada is required to report in person on a monthly basis and pay bond supervision fees.

43.     Plaintiff Estrada had a consistent job prior to being placed on pre-trial conditions and bond supervision, but lost his job as a result and is now indigent.

44.     Plaintiff Estrada now struggles to pay the child support he used to be able to afford.

45.     Plaintiff Estrada cannot afford bond supervision fees, but he pays what he can to avoid jail.

46.     Plaintiff Estrada is required to fill out an intake form during each check-in that asks him, among other matters, questions about his health, personal relationships, and finances.

47.     Plaintiff Estrada has not been convicted of the crime for which bond supervision was ordered.

**C.     Defendants' Wealth-Based Bond Fee Scheme Violates Procedural Due Process and Equal Protection**

48.     Defendants run a bond fee scheme against pre-trial arrestees who have not been convicted of any crime.  The scheme not only deprives pre-trial arrestees of their property without

due process, but is also a form of wealth-based discrimination, because bond fees are assessed to all pre-trial arrestees on bond supervision, regardless of their ability to pay.  The scheme is also an improper conflict of interest, because Defendants have a direct financial stake in the bond fees, which they collect via threats to send pre-trial arrestees back to jail for non-payment.  Defendants also violate pre-trial arrestees' right to privacy with invasive questions as part of Bond Office forms.

a.     **Defendants Deprive Class Members of their Property Without Due Process**

49.    Plaintiffs have a property interest in the dollar amount of the monthly bond fee. Due process requires that Plaintiffs be provided with a meaningful, pre-deprivation opportunity to challenge any deprivation, by a state actor, of their property.  *Mathews v. Eldridge*, 424 U.S. 319 (1976).

50.    In particular, bail payments imposed prior to trial must meet stringent due process requirements.  *See United States v. Salerno*, 481 U.S. 739, 751–52 (1987).  Defendants' bond fees carry no procedural protections whatsoever.

51.    First, Defendants only impose these bond fees on pre-trial arrestees, *i.e.*, individuals who have not been found guilty of anything.  In essence, arrestees are assessed an ongoing monetary sanction even though they are presumed innocent.

52.    Even when a case is discharged, including by dismissal or acquittal, Defendants do not issue refunds but instead continue to pursue collection of any arrears — and threaten driver's license suspensions if arrears are not paid.

53.    Second, Defendants provide no ability to contest these fees.  They are imposed as a matter of routine on pre-trial arrestees released on bond supervision without a hearing, without counsel, without notice, and without a timeline.

**b.    Defendants' Bond Fees Function as a Form of Arbitrary Bail in Violation of Due Process**

54.    In practice, pre-trial arrestees' bail amount only serves as an initial down-payment on their pre-trial freedom.  Bond fees are an ongoing extension of their bail; to remain out of jail, pre-trial arrestees must continuously pay bond fees.  Otherwise, Defendants can (and do) file revocation reports with the court that can put pre-trial arrestees back in jail.

55.    Therefore, bond fees are subject to the same constitutional parameters and protections as bail.  *Salerno*, 481 U.S. at 751–52.

56.    Yet these fees are imposed without any basis; at no point are these fees tied to a pre-trial arrestee's flight risk, danger to the community, the seriousness of the alleged offense(s), or any other factor.

57.    In addition, bond fees are assessed until a case is resolved by either conviction, plea, acquittal, dismissal of charges, or lapsing of the statute of limitations.  Cases vary greatly in how long they take to resolve; the pre-trial arrestee is thus subject to the whims of the cadence of the criminal legal system — continuances, the timing of plea offers, etc. — to determine his ultimate exposure to fees.  Thus a pre-trial arrestee has no notice of how much he will ultimately face in bond fees beyond the fixed $50/month rate.  Unlike bail, which is a fixed and one-time amount, bond fees are indeterminate because they are indefinite, further violating due process.

58.    Indeed, the pre-trial arrestee who exercises his constitutional right to present a defense and have a trial is punished for taking the time necessary to prepare his defense and have a trial, because each month that passes comes with additional fees.

59.    The arbitrariness with which Defendants impose bond fees — divorced from any risk factor, on top of already-paid bail, and indefinite to the point of infringing on other constitutional rights such as the right to trial — violates due process.

9

### c.      Defendants' Financial Stake in Bond Fees Violates Due Process

60.      The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officers and civil and criminal law enforcement actors from having a "direct, personal, and substantial pecuniary interest" in the cases they prosecute and supervise.  *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927); *see also Caliste v. Cantrell*, 937 F.3d 525, 532 (5th Cir. 2019) (holding criminal court's practice of using money generated from bond fees to pay judicial expenses violated due process); *Cain v. White,* 937 F.3d 446, 454 (5th Cir. 2019) (holding judges' imposition and collection of fines and fees used to pay the salaries of their staff and other expenses violated due process).

61.      Defendants are supposed to be neutral public officials serving in a law enforcement capacity.  They are supposed to monitor all pre-trial release conditions set by Anderson County Court.  In practice, Defendants focus on collecting the bond fee that they (not the court) impose and that they retain to cover their own salaries and expenses.  Every Bond Office check-in form focuses on whether payment was made, or, if not, why not and when it will be paid.  *See* Ex. 6, Sample Bond Office Visit Form.  Defendants collect bond fees for the explicit purpose of covering the Bond Office's expenses, including Defendant Garcia's salary.

62.      For example, in the December 2012 monthly bond report sent by former Bond Supervision Officer Cindy Singletary to Anderson County Judge Johnston, the total amount of fees collected from April–December 2012 is listed in the amount of $41,447.80, immediately followed by a note that "Salary plus benefits paid to BSO [Bond Supervision Officer] = $36,969.57 for 4/12-12/12."  Ex. 7, December 2012 Bond Office Status Report.  These fees add up to thousands of dollars per month and tens of thousands of dollars per year, covering most, if not all, of the Bond Office's expenses.

63.     Defendants enforce the fees by tying pre-trial freedom to payment of the fees. Plaintiffs paid — and continue to pay — bond fees out of fear of going back to jail.  Martinez Decl. ¶ 7; Estrada Decl. ¶ 14. Every check-in with Defendant Garcia involves questions about the pre-trial arrestee's financial status and bond fee payment history.  If a pre-trial arrestee pays his fees, then Defendant Garcia will not perform the official act of filing a revocation report with the court, thereby avoiding jail time for the pre-trial arrestee.  *See* Ex. 8, sample Bond Supervision Violation Report form listing non-payment as a violation.

64.     Thus, to stay out of jail, pre-trial arrestees have to show up to the Bond Office to pay a monthly fee, for which they receive nothing more than temporary protection from going back to jail.

65.     Given that Defendant Garcia has full discretion over whether pre-trial arrestees report in person or over the phone and how often they drug test, she cannot make supervision decisions in a neutral manner when her decisions directly impact the Bond Office's revenue that pays for her salary.

66.     The conflict of interest inherent to Defendants' pay-or-jail scheme is further illuminated by the monthly reports that Defendant Garcia submits to Anderson County Judge Johnston.  While the Bond Office is in charge of monitoring all bond conditions, the entirety of these monthly reports is to detail exactly how much money the Bond Office collected, in how many payments, over how many visits.  These reports also include details about ongoing fee collection efforts for cases that have been discharged.  *See* Ex. 4, January 2022 Bond Office Report. The collection of bond fees seems to be Defendants' primary concern when supervising pre-trial arrestees.

67.     Defendant Garcia has a direct, personal, and substantial financial stake in every fee that she charges, and it is Defendants who set the fee, determine the frequency of payment, and have established a policy to not reimburse fees in the event of an acquittal or dismissal and to pursue arrears even when a case is no longer in pre-trial status and is therefore no longer under Defendants' jurisdiction.

68.     Because of this conflict of interest, Defendants are not neutral law enforcement officers and violate due process every time they charge the bond fee.

### d.      Defendants' Failure to Consider Ability to Pay in Assessing Bond Fees or Offer Non-Monetary Alternatives Violates Procedural Due Process

69.     The Fourteenth Amendment's Procedural Due Process Clause prohibits outcomes in the criminal legal system from turning on a person's ability to make a monetary payment.  *See Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (defendant cannot have his probation revoked for being too poor to pay restitution); *Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full") (quotations omitted); *Williams v. Illinois*, 399 U.S. 235, 244 (1970) (Equal Protection Clause of the Fourteenth Amendment "requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status"); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion) (finding state may not condition criminal defendant's right to appeal on ability to pay for trial transcript because there "can be no equal justice where the kind of trial a man gets depends on the amount of money he has").

70.     Defendants do not evaluate arrestees' ability to pay at any point prior to or while assessing bond fees.

71.     Defendants do not offer payment plans, reduced fees, waivers, or non-monetary

alternatives (such as proof of an employment search, proof of inability to pay, or any other alternative).  A $50 monthly bond supervision fee is assessed to all. [1]

72.     Plaintiffs Martinez and Estrada were found indigent by the court and thus qualified for court-appointed attorneys.  Yet neither of them was asked about their ability to pay bond or urinalysis fees before they were assessed fees.

73.     Defendants' failure to assess ability to pay means that indigent arrestees are charged bond fees that they cannot afford — fees that quickly add up to hundreds of dollars.  Both Plaintiff Martinez and Estrada have been on bond supervision for several months and have been charged hundreds of dollars in bond supervision fees.

74.     Ironically, the Bond Office's intake and monthly check-in forms ask several questions about pre-trial arrestees' income and employment status, *see* Ex. 9, Bond Office Intake Form and Ex. 6, Bond Office Visit Form, yet those questions never translate into the Bond Office developing a payment plan or reducing or waiving the bond fee according to ability to pay.

> **e.     Defendants' Creation of Debtors' Prisons by Revoking Class Members Who Do Not Pay Their Bond Fees Violates Due Process**

75.     Debtors' prisons are one aspect of the Fourteenth Amendment's due process prohibition against punishing people for failure to make a monetary payment.  *See Bearden*, 461 U.S. at 667; *Tate*, 401 U.S. at 398; *Williams*, 399 U.S. at 244; *Griffin*, 351 U.S. at 19.  The right to freedom from detention is fundamental, and the United States Supreme Court has never wavered from the principle that "[f]reedom from imprisonment — from government custody, detention, or

---

[1] While Plaintiff's claim is brought under federal law, the bond fee is also not authorized under state law. Texas Code of Criminal Procedure 17.42 only authorizes a *one-time* bond fee of $20 or three percent of the pre-trial arrestee's bail amount, whichever is greater.  While Plaintiffs do not concede the constitutionality of this provision, Defendants do not apply this provision faithfully.  A monthly $50 bond fee is far beyond its scope.

other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

76.     Given this fundamental right to liberty, any attempt to deprive someone of their liberty — including through incarceration for failure to make a monetary payment — is subject to heightened scrutiny.  *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests" such as freedom from government detention); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *Salerno*, 481 U.S. at 748 ("compelling" government interests can justify pre-trial detention); *Williams* at 241–42 (the "passage of time has heightened rather than weakened the attempts to mitigate the disparate treatment of indigents in the criminal process").

77.     Defendants' debtors' prisons do not meet this heightened standard.  Liberty cannot hinge on ability to pay and Defendants' attempts to do so are not narrowly tailored nor do they serve a compelling government interest.

78.     Defendants use the threat of jail time to coerce pre-trial arrestees into paying bond fees that line Defendants' own pockets. Defendants then file revocation reports with the district attorney when payments are not made, *see* Ex. 8 (sample Bond Supervision Violation Report form listing non-payment as a violation), even if pre-trial arrestees cannot afford the fees.  These revocation reports result in some pre-trial arrestees having their bond revoked and being sent back to jail.

79.     Even if the revocation is based on multiple alleged violations of the terms of pre-trial release, the consideration of failure to pay bond fees is unconstitutional.

80.     Defendants' role in revoking class members' bonds based on failure to pay bond fees violates due process.

### f.    Defendants' Failure to Consider Ability to Pay Is Also a Form of Wealth-Based Discrimination that Violates Equal Protection

81.     The Fourteenth Amendment's Equal Protection Clause also prohibits punishing people, including returning them to jail, simply because they are poor.  Hinging a person's liberty on their ability to pay is an unconstitutional form of wealth-based discrimination.  *See Bearden*, 461 U.S.  at 667; *Tate*, 401 U.S. at 398; *Williams*, 399 U.S. at 244; *Griffin*, 351 U.S. at 19.

82.     Pre-trial arrestees are treated differently based on their financial status.  A wealthy pre-trial arrestee who is able to afford his bond fees will not face revocation unless he willingly refuses to pay.  An indigent pre-trial arrestee, on the other hand, will face revocation even if he is paying everything that he can; his non-payment is not willful.  Yet the indigent pre-trial arrestee's financial condition is never taken into consideration before revoking him.

83.     Because this scheme treats similarly-situated people (pre-trial arrestees) differently solely on the basis of their financial status, this scheme is an unlawful form of wealth-based discrimination in violation of the Equal Protection Clause.

### g.    Urinalysis as a Bond Condition Also Violates Due Process and Equal Protection

84.     Urinalysis fees suffer from many of the same constitutional deficiencies as bond fees.

85.     As with bond fees, pre-trial arrestees have no ability to contest the imposition of urinalysis nor the associated obligatory fees.

86.     As with bond fees, pre-trial arrestees have no notice of how much they will have to pay in urinalysis fees.  The frequency of the tests is left to Defendant Garcia's discretion and tests

are imposed for as long as the case remains in pre-trial status.  Both Plaintiffs Martinez and Estrada are on random drug testing, left to Defendant Garcia's discretion.

87.     Defendant Garcia also has full discretion over whether pre-trial arrestees have to report in person or over the phone, contributing to her discretion over how often pre-trial arrestees must drug test, for which she charges them.

88.     Each test costs $20 and Defendants do not conduct an ability to pay assessment.

89.     The amount of money collected through urinalysis fees is of great importance to Defendants and the court; this income is part of every monthly report Defendant Garcia submits to Anderson County Judge Johnston.  *See, e.g.*, Ex. 10, November 2021 Bond Office Report (showing $313 collected in urinalysis fees that month).

90.     Defendant Garcia uses jail time to induce payment of urinalysis fees as well.

91.     Even when a case is no longer in pre-trial status, Defendants still send letters to those with arrears threatening driver's license suspensions if arrears are not paid. *See* Ex. 5, Sample Collection Letter from Bond Officer Garcia.

92.     Urinalysis is also imposed arbitrarily, without any findings of a nexus between the alleged crime and the need for drug and alcohol monitoring.  While there may be cases in which urinalysis is a reasonable condition, urinalysis is imposed for various crimes, without rhyme or reason.

93.     These various deficiencies in how urinalysis fees are imposed violate due process and equal protection.

> **h.      Defendants' Intake and Check-In Forms Violate Plaintiffs' Right to Privacy**

94.     The constitutional right to privacy consists of "two inter-related strands," *Cantu v. Rocha*, 77 F.3d 795, 806 (5th Cir. 1996): the autonomy-strand, which relates to individuals' ability

to make their own decisions (regarding, for example, family and healthcare) and the confidentiality-strand, where the "individual interest [is] in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977).

95.     The confidentiality-strand of the constitutional right to privacy is recognized by the Fifth Circuit as part of the Fourteenth Amendment's due process protections.  *See, e.g.*, *Zaffuto v. City of Hammond*, 308 F.3d 485, 489 (5th Cir. 2002).

96.     When determining whether a government actor has violated a private citizen's right to privacy, courts employ a balancing test: "An individual's right to privacy is violated if: (1) the person had a legitimate expectation of privacy; and (2) that privacy interest outweighs the public need for disclosure." *Cantu*, 77 F.3d at 806 (citing *Fadjo v. Coon*, 633 F.2d 1172 (5th Cir. 1981)). Confidentiality-strand claims are reviewed somewhere between rational basis and intermediate scrutiny — "[s]omething more than mere rationality." *Plante v. Gonzalez*, 575 F.2d 1119, 1134 (5th Cir. 1978).

97.     Confidentiality-strand claims can be based on the mere asking of personal questions, even without subsequent disclosure of the answers to third parties.  *Ramie v. City of Hedwig Village*, 765 F.2d 490 (5th Cir. 1985) (holding right to privacy "encompasses . . . the freedom from being required to disclose personal matters to the government"); *see also City of Sherman v. Henry*, 928 S.W.2d 464, 467 (Tex. 1996) (describing the confidentiality strand's protection against "government action that is intrusive or invasive" as "the right most valued by civilized men").

98.     During every check-in at the Bond Office, pre-trial arrestees are subjected to invasive and unusual questions that are collected on forms filled out by Bond Officer Defendant Garcia.  These questions include: "Indicate any problems you are having with your family,

companions, or co-workers." Ex. 9, Bond Office Intake Form and Ex. 6, Bond Office Visit Form. The pre-trial arrestee has a legitimate expectation of privacy in "*any* problems" he may be experiencing with the people he is closest to, and those problems may well fall in the realm of the "most private details of his life" that give rise to a confidentiality-strand privacy claim. *Fadjo*, 633 F.2d at 1174.  Perhaps narrower questions would be relevant, but the Bond Office has no legitimate interest in asking this broad question or knowing its answer; what conceivable nexus this has to the Bond Office's duties is unclear.  The question is also so vague as to further support pre-trial arrestees' legitimate expectation of privacy in this information and the non-existent need for public disclosure of this information.

99.     While government agents "must have the freedom at least to ask the questions they believe will aid them in [an] investigation," even where the questions are "irrelevant and not within the government's proper sphere of concern," *Ramie*, 765 F.2d at 493, the Bond Office is not an investigative office.  Furthermore, this question has nothing to do with the types of conditions that can be imposed pre-trial and its vagueness makes unclear how an answer could assist in monitoring bond conditions.  If, for example, a stay-away order is required as part of bond conditions, that can be verified through other means, nor is it clear how this invasive question would help the Bond Office know if the stay-away order was being followed.

100.    Defendants also ask if pre-trial arrestees have violated any of their pre-trial conditions, essentially asking pre-trial arrestees to admit to criminal activity, since violation of pre-trial conditions can land a pre-trial arrestee back in jail.

101.    Defendants also ask several questions about class members' income and employment status. Ex. 9, Bond Office Intake Form and Ex. 6, Bond Office Visit Form.  Given that Defendants do not conduct an ability to pay assessment or offer payment plans or waivers

based on class members' financial status, the relevance of these questions is unclear.  Once again, class members have a legitimate expectation of privacy in their financial information and there is no public need for disclosure of the information, at the very least because this information is not used to adjust the level of bond or urinalysis fees to match ability to pay.

102.    By asking such questions, Defendants treat arrestees as if they are probationers with a decreased right to privacy, while ignoring the key constitutional difference: arrestees have not been convicted of any crime.

103.    Defendants' forms violate arrestees' right to privacy and therefore must be modified to eliminate the unlawful questions.

## CLASS ACTION ALLEGATIONS

104.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Martinez and Estrada bring this action on behalf of themselves and all others similarly situated, as representative of the following four classes:

- Main Damages Class: All persons who are or have been on pre-trial bond supervision in Anderson County and charged bond supervision and/or urinalysis fees.

- Indigent Damages Subclass: All indigent persons who are or have been on pre-trial bond supervision in Anderson County and charged bond supervision and/or urinalysis fees.

- Main Injunctive Class: All persons who are or will be on pre-trial bond supervision in Anderson County and charged bond supervision and/or urinalysis fees.[2]

- Indigent Injunctive Subclass: All indigent persons who are or will be on pre-trial bond supervision in Anderson County and charged bond supervision and/or urinalysis fees.[3]

---

[2] In addition to claims for injunctive relief, the Main Injunctive Class also brings claims for declaratory relief. "Main Injunctive Class" is used as a shorthand.

[3] In addition to claims for injunctive relief, the Indigent Injunctive Subclass also brings claims for declaratory relief. "Indigent Injunctive Subclass" is used as a shorthand.

105.     Plaintiffs, and others similarly situated, as set forth herein are victims of this pattern of illegal collection of fees, indiscriminate drug testing requirement, and invasive questioning and have sustained damages as a direct and proximate cause of these violations.

106.     As described below, each class and subclass satisfies the prerequisites of numerosity, commonality, typicality, and adequacy of representation required by Rule 23(a)(1), (2), (3), and (4) of the Federal Rules of Civil Procedure to procedure as a class action.

107.     Because of the risk of inconsistent adjudications or prejudice to absent class members, as well as the request for injunctive relief and damages, the proposed classes also meet the requirements of Rule 23(b)(1), (2), and (3).

### A.     Numerosity - Fed. R. Civ. P. 23(a)(1)

108.     The persons in the proposed classes are so numerous that joinder of all members is impracticable.  Although the exact number of class members is unknown to Plaintiffs at this  time, it is anticipated that the classes are composed of hundreds of members.  This estimate of the number of potential class members is based upon data provided by Anderson County in discovery in *Perkins v. Anderson County*, No. 6:20-cv-00076-JCB (E.D. Tex. 2020), which shows that between 2018 and 2021, the Bond Office had 591 cases, with an average of 148 cases per year. *See* Ex. 11, Anderson County Interrogatory Response. Cases also consistently increase from year to year. *Id.*

109.     The subclasses of indigent class members are also sufficiently numerous. According to the Texas Indigent Defense Commission, approximately 60% of criminal defendants in Anderson County in 2021 received a court-appointed attorney.[4]  With well over one hundred bond supervision cases per year, 60% of that amount for indigent subclasses would total well over

---

[4] Texas Indigent Defense Commission, *Indigent Defense Data for Texas, Anderson County*, https://tidc.tamu.edu/public.net/Reports/DataSheet.aspx?cid=1 (last viewed April 28, 2022).

60 subclass members per year and total in the hundreds over the course of the class period, satisfying numerosity.

110.    Ascertainability of the exact number of class and subclass members is readily achievable through analysis of Defendants' records.

**B.      Commonality - Fed. R. Civ. P. 23(a)(2)**

111.    The relief sought is common to all Class Members: a permanent injunction against the charging of bond supervision and urinalysis fees, reimbursement for sums paid, and a permanent injunction against the asking of certain questions in the Bond Office's forms, so as to protect the constitutional rights of Class Members now and in the future.

112.    There are also issues of law and fact common to the class.

113.    Among the common issues of fact are:

a.      Have class members been charged with crimes in Anderson County, Texas, and been required to pay bond and urinalysis fees to Defendants without having been found guilty of those crimes?

b.      Do Defendants require ongoing, monthly payment of bond and urinalysis fees as a condition of pre-trial release?

c.      Are bond fees used to pay for Defendant Garcia's salary and the Bond Office's operating expenses?

d.      Do Defendants consider pre-trial arrestees' ability to pay bond and urinalysis fees?

e.      Do Defendants use jail time to induce payment of bond and urinalysis fees?

f.      Do the Bond Office's forms ask questions about pre-trial arrestees' personal relationships and finances unrelated to the duties of the Bond Office?

114.    Common issues of law include:

a.      Does the collection of bond fees without findings of guilt constitute a deprivation of property in violation of the Fourteenth Amendment's due process guarantees?

b.      Does the ongoing, indefinite nature of the bond fee violate due process?

c.      Does Defendants' personal financial stake in bond fees constitute an unconstitutional conflict of interest?

d.      Do the Equal Protection and Due Process Clauses of the Fourteenth Amendment prohibit the charging of bond fees without considering ability to pay and offering non-monetary alternatives?

     e.     Does the Due Process Clause of the Fourteenth Amendment prohibit jailing indigent class members for failure to pay bond fees?

     f.     Does Defendants' imposition of urinalysis fees without considering ability to pay, without a timeline, and with threats of jail time and driver's license suspensions for non-payment violate due process and equal protection?

     g.     Do Defendants' Bond Office forms violate Plaintiffs' right to privacy?

## C.    Typicality - Fed. R. Civ. P. 23(a)(3)

115.    Plaintiffs are members of both the classes and the subclasses and have been injured in the same way as the other members of the classes and subclasses.  Plaintiffs' claims are typical of the proposed class and subclass members; indeed, they are identical.

116.    Defendants illegally collect monthly bond fees from all class members and urinalysis fees from those subject to drug testing.

117.    All class members have yet to be convicted of a crime and are charged bond fees by Defendants while class members' cases remain in pre-trial status.

118.    All class members must continue to pay bond fees without notice as to how long — and therefore how much — they will have to pay in bond fees.

119.    As all class members pay bond fees, all class members are paying for Defendants' salaries and operating expenses.

120.    All subclass members are charged bond fees without any ability to pay assessment. All subclass members are deprived of non-monetary alternatives to the fee and all are subject to jail when they non-willfully fall behind on payments because they are indigent.

121.    All class members must answer the same invasive questions on Defendants' forms, which they must answer every time they go to the Bond Office.

## D.    Adequacy - Fed. R. Civ. P. 23(a)(4) and 23(g)

122.    Plaintiffs will fairly and adequately represent the interests of the classes. Plaintiffs have no claim antagonistic to those of the classes. In support of this proposition, Plaintiffs would show that:

- Plaintiffs are members of the proposed classes and subclasses;
- Plaintiffs are interested in representing the proposed classes and subclasses;
- Plaintiffs have no interest adverse to the rest of the classes and subclasses; and
- Plaintiffs have suffered the same harm as the proposed classes and subclasses.

123.    Class counsel will also fairly and adequately represent the interests of the class. Plaintiffs are represented by attorneys from The Law Office of Charles W. Nichols, P.C. and Equal Justice Under Law.  Equal Justice Under Law attorneys have experience in litigating complex civil rights matters in federal court, particularly with regards to wealth-based discrimination.  The Law Office of Charles W. Nichols, P.C. has over forty years of experience in representing plaintiffs in litigating complex civil matters in Texas state and federal court, including civil rights matters. Class counsel has extensive knowledge of the relevant constitutional and statutory law.  Class counsel also have a detailed understanding of state law and county practices as they relate to federal constitutional requirements.

124.    Counsel have devoted significant time and resources to become intimately familiar with how Anderson County's bond fee scheme works in practice.  Counsel have also developed relationships with some of the individuals victimized by Defendants' practices.  The interests of the Class Members will be fairly and adequately protected by the Plaintiffs and their attorneys.

**E.    Predominance and Risk of Inconsistent Adjudications - Fed. R. Civ. P. 23(b)(1)**

125.    The common questions of fact and legal issues applicable to each individual member of the proposed class are identical.  The prosecution of separate suits by individual members of the proposed class would create a risk of inconsistent adjudications of the legal issues

and would establish incompatible standards of conduct for any party opposing the class.  Common questions of law or fact predominate over any questions affecting only individual class members.  Nothing short of a universally-applied remedy to all members of the class would address the allegations set forth in this complaint.

###### F.     Injunctive and Declaratory Relief - Fed. R. Civ. P. 23(b)(2)

126.    The Injunctive Classes seek injunctive and declaratory relief under Rule 23(b)(2) to enjoin Defendants from charging bond and urinalysis fees and from asking certain invasive questions via the Bond Office's forms. Such injunctive and declaratory relief is appropriate because Defendants have acted in the same unconstitutional manner with respect to all class members (including subclass members) and an injunction prohibiting Defendants from charging bond and urinalysis fees would provide relief to every class (and subclass) member.  While subclass members have a few additional claims as to why Defendants' bond fee scheme is unconstitutional as compared to class members, the injunctive and declaratory relief requested would provide relief to everyone, class and subclass members alike.

###### G.     Damages - Fed. R. Civ. P. 23(b)(3)

127.    The Damages Classes also seek damages for the bond and urinalysis fees that they have been unconstitutionally charged and for which they have paid.  All class and subclass members are supervised by Defendants and pay the same fees to Defendants.  Common questions of fact and law concerning Defendants' practices and the constitutionality of those practices therefore predominate over individual questions.  A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  Individual adjudications would be inefficient (not in the least because the likely recovery of any individual class member would be swallowed up by litigation costs) and risk inconsistent rulings, even though every adjudication

would turn on the same policies — namely, Defendants' policy of charging bond and urinalysis fees and Defendants' policy of using forms that violate class (and subclass) members' right to privacy.  This case is far more manageable as a class action than as a series of individual adjudications because of the common issues of fact and law, which prevail over any minor individual differences among class members. Thus certification under Rule 23(b)(3) is also appropriate.

## CLAIMS FOR RELIEF

### Count One: Violation of Due Process Regarding Deprivation of Property Interest in Bond Supervision Fee Amount

128.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

129.    By charging Plaintiffs for bond fees without any finding of guilt, and without reimbursement in the event of acquittal or dismissal, Defendants deprive Plaintiffs of their property without due process as guaranteed under the Fourteenth Amendment.

### Count Two: Violation of Procedural Due Process for Arbitrary Bail

130.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

131.    Bond fees are imposed as quasi-bail, yet without the attendant due process protections. They are imposed without nexus to some kind of risk factor indicating the necessity of supervision and without any timeline as to how long (and therefore how much) pre-trial arrestees will be subjected to bond fees. Bond fees are charged as long as the case remains in pre-trial status, yet Plaintiffs do not have control over how long a case remains in such status.

### Count Three: Violation of Procedural Due Process for Financial Conflict of Interest

132.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

133.    Due process prohibits neutral judicial and law enforcement officials from having a financial interest in the outcome of their cases.

134.    Defendants have a financial interest in every case sent to the Bond Office, for the bond fees pay for the salary of the Bond Officer and the operating expenses of the Bond Office.

135.    Defendants therefore violate due process for their pre-trial fee scheme from which they directly profit.

### Count Four: Violation of Procedural Due Process Regarding Ability to Pay

136.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

137.    The Fourteenth Amendment's Procedural Due Process Clause prohibits outcomes in the criminal legal system from hinging on a person's ability to make a monetary payment.

138.    Defendants provide constitutionally deficient due process by allowing bond fees to be assessed without considering ability to pay.

### Count Five: Violation of Procedural Due Process Regarding Revocation for Non-Payment of Bond Fee

139.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

140.    The Fourteenth Amendment's Procedural Due Process Clause prohibits outcomes in the criminal legal system from hinging on a person's ability to make a monetary payment.

141.    Defendants provide constitutionally deficient due process by allowing revocations of bonds based on failure to pay bond fees without assessing pre-trial arrestees' ability to pay those fees.

142.    In effect, Defendants criminalize poverty for their role in jailing pre-trial arrestees who cannot afford bond fees.

143.    These "debtors' prisons" are unconstitutional.

**Count Six: Violation of Equal Protection for Wealth-Based Discrimination**

144.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

145.    The Fourteenth Amendment's Equal Protection Clause also prohibits outcomes in the criminal legal system from turning on a person's ability to make a monetary payment.

146.    Defendants' bond fee scheme treats similarly-situated individuals — pre-trial arrestees — differently based on whether they are indigent. Indigent pre-trial arrestees risk incarceration and the suspension of driver's licenses simply because they cannot afford bond fees.

147.    This wealth-based discrimination is prohibited by the Equal Protection Clause.

**Count Seven: Violation of Due Process and Equal Protection Regarding Urinalysis**

148.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

149.    Defendants' imposition of urinalysis as a bond condition, with the attendant cost, is done without considering ability to pay, without a timeline, with threats of jail time and driver's license suspensions for non-payment, and without reimbursement in the event of acquittal or dismissal, in violation of due process and equal protection.

**Count Eight: Violation of Right to Privacy**

150.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

151.    Defendants' asking of invasive personal questions as part of Bond Office forms —
questions that have no nexus to the duties of the Bond Office nor are of legitimate government
interest — violates class members' constitutional right to privacy.

**REQUEST FOR RELIEF**

152.    WHEREFORE, Plaintiffs demand a jury trial and the following relief: Plaintiffs
and the classes they represent have suffered the following damages, for which they seek recovery
from Defendants:

- A declaratory judgment that subjecting Plaintiffs to Defendants' conduct as
  alleged in the Counts listed above is unlawful and unconstitutional;

- An order and judgment preliminarily and permanently enjoining Defendants from
  continuing the above-described unconstitutional and illegal policies and practices
  against Plaintiffs and the Classes of similarly-situated people on whose behalf they
  are bringing suit;

- A judgment ordering Defendants to train all court personnel and Bond Office
  employees on the above-mentioned permanent injunction;

- A judgment compensating Plaintiffs and the Classes of similarly-situated
  individuals for the damages that they suffered as a result of Defendants'
  unconstitutional and unlawful conduct, specifically all sums paid to the Bond
  Office;

- An order and judgment granting reasonable attorneys' fees and costs pursuant to 42
  U.S.C.  §§ 1983 and 1988;

- An order and judgment granting pre- and post-judgment interest;

- And any other relief this Court deems just and proper.

Respectfully submitted,


By:  /s/ Charles W. Nichols
      Charles W. Nichols, Texas Bar No. 14994200
      Donald J. Larkin, Texas Bar No 24057702
      The Law Office of Charles W. Nichols, P.C.
      Email:  cnichols@charleswnicholslaw.com
      Email:  donald@charleswnicholslaw.com
      617 E. Lacy St.
      Palestine, TX 75801
      Tel. (903) 729-5104
      Fax. (903) 729-0347
      Admitted before the United States District
      Court, Eastern District of Texas

By:  /s/ Natasha Baker
      Natasha Baker, D.C. Bar No. 1600874
      Phil Telfeyan, D.C. Bar No. 1029157
      Equal Justice Under Law
      400 7th St. NW, Suite 602
      Washington, D.C. 20004
      (202) 505-2058
      nbaker@equaljusticeunderlaw.org
      ptelfeyan@equaljusticeunderlaw.org

      *Attorneys for Plaintiffs*